J-S04017-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

IN THE INTEREST OF: S.F., A MINOR  :   IN THE SUPERIOR COURT
         :       OF PENNSYLVANIA
         :
APPEAL OF: J.S., FATHER        :
         :
         :
         :
         :
         :       No. 2776 EDA 2019

Appeal from the Order Entered September 6, 2019
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-DP-0002064-2016

IN THE INTEREST OF: S.F., A MINOR  :   IN THE SUPERIOR COURT
         :       OF PENNSYLVANIA
         :
APPEAL OF: J.S., FATHER        :
         :
         :
         :
         :
         :       No. 2777 EDA 2019

Appeal from the Decree Entered September 6, 2019
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-AP-0000660-2018

BEFORE: BENDER, P.J.E., STABILE, J., and MURRAY, J.

MEMORANDUM BY STABILE, J.:        **FILED FEBRUARY 28, 2020**

J.S. ("Father") appeals from the decree entered September 6, 2019, which terminated involuntarily his parental right to his son, S.F., born in June 2009 ("Child").[1] Father also appeals from the order entered September 6,

---

[1] On July 30, 2019, the court terminated the parental rights of S.F. ("Mother") pursuant to a consent to adoption signed December 18, 2018. **See** Decree, 7/30/19, at 1. Mother has not appealed, nor has she filed a brief in the instant appeal.

2019, which changed Child's permanent placement goal from reunification to adoption. After careful review, we affirm.

We summarize the facts and procedural history of this matter as follows. On September 20, 2016, the Philadelphia County Department of Human Services ("DHS") filed a dependency petition, averring that on August 19, 2016, DHS received a General Protective Services ("GPS") report alleging that Mother was not compliant with necessary medical treatment for Child's one-year-old sibling, J.F. Dependency Petition, 9/20/16, at 1-3. Upon investigation, DHS discovered that Child and his six siblings were all delinquent in medical care, and that Child had not attended school during the 2016-2017 school year and had thirty-one unexcused absences during the previous school year. *Id.* at 1-4. At that time, DHS recommended that Child remain in the custody of his mother; Father's whereabouts were unknown. *Id.* Child was adjudicated dependent on September 28, 2016. Order of Adjudication, 9/28/16, at 1-2.

On October 14, 2016, Community Umbrella Agency ("CUA") Turning Points created an initial Single Case Plan ("SCP") for Father. Petition for Goal Change to Adoption, 8/13/18, at Exhibit A. Father's goals were identified as make his whereabouts known to CUA and actively participate in the permanency planning for Child; ensure Child attended all medical appointments and followed through with all recommendations; and ensure that Child attended school consistently and complete his assignments. *Id.*

On November 17, 2016, DHS obtained an order for protective custody of Child due to his continued truancy and Mother's failure to ensure that the children attended medical appointments. Order of Protective Custody, 11/17/16, at 1-2. DHS obtained a shelter care order on November 18, 2016, and filed an amended dependency petition in January 2017, averring that Father's whereabouts were still unknown. Shelter Care Order, 11/18/16, at 1, Dependency Petition, 1/12/17, at 1-3. Since that time, Child has resided in foster care.

Permanency review hearings were held, without Father's participation, in January 2017, April 2017, July 2017, October 2017, and January 2018. On January 24, 2018, a revised SCP was created for Father, though his objectives remained the same. Petition for Goal Change to Adoption, 8/13/18, at Exhibit A. Additional permanency review hearings were held in April 2018 and July 2018.

On August 13, 2018, DHS filed a petition to change Child's permanency goal to adoption and a petition to terminate involuntarily Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8). Petition for Goal Change to Adoption, 8/13/18, at 1; Petition For Involuntary Termination of Parental Rights, 8/13/18, at 1. The petition averred that Father's last known address was State Correctional Institution ("SCI") Huntingdon. *Id.*

The court held a bifurcated termination and goal change hearing on July 30, 2019, and September 6, 2019.[2] DHS presented the testimony of Kaitlin Sullivan, CUA Turning Points for Children case manager; T-Ana Carpenter, Turning Points for Children case manager; and Roya Paller, forensic social worker. Father, represented by counsel, was present at the hearings, and testified on his own behalf. Child was represented by Kevin Birley, Esquire, guardian *ad litem*, who was standing in for Carla Beggin, Esquire, counsel for Child. N.T., 9/6/19, at 3.

Ms. Sullivan testified that she has been on the case since November 2018. *Id.* at 5. During her involvement in the matter, Ms. Sullivan set limited objectives for Father, who was incarcerated. *Id.* CUA had no contact with Father until shortly before the hearing, on August 23, 2019. *Id.* Father indicated that he was not willing to relinquish his rights and stated that, although he had been incarcerated since approximately 2016, he believed that Child knew him. *Id.* at 5-6. Ms. Sullivan testified that Father entered a guilty plea on April 7, 2016, to charges of aggravated assault, possession of a firearm prohibited, and robbery with a threat of immediate serious injury. *Id.* at 6. Father was sentenced to five and one-half to eleven years of incarceration, and would be incarcerated for another two and one-half years

---

[2] An examination of the record reveals that Child has numerous siblings with different fathers, and it appears that the details of his case not discussed in any detail during the July hearing.

prior to his first parole hearing. *Id.* at 6. Ms. Sullivan testified that there was no outreach to Father made in the electronic case file. *Id.* at 13.

Ms. Sullivan testified that prior to the hearing, she spoke with her case manager, who in turn had spoken with Child regarding Father. *Id.* at 6-7. Child understood his permanency goal and wanted to be adopted, and to remain in his pre-adoptive foster home with two half siblings. *Id.* at 7-8. Child has a parent/child relationship with his caregivers and is thriving in the home. *Id.* at 9. Child does not remember Father and does not have a parent/child relationship with Father. *Id.* Ms. Sullivan testified that her only knowledge of Child's and Father's relationship was what Father self-reported to her, namely that, prior to Father's incarceration, he was involved in Child's life and did do things such as take Child to the doctor and to school. *Id.* at 11. Ms. Sullivan did not believe Child would suffer irreparable harm if Father's parental rights were terminated. *Id.* at 10-11.

Father testified that he has been incarcerated since August 2015, and that prior to his incarceration, he had a relationship with Child, who was six years old at the time. *Id.* at 17. Father testified that he loves Child to death and Child loves him. *Id.* Father claimed that he used to have custody of his son every week and would keep him for months. *Id.* Father testified that the last time he spoke to Child was towards the end of 2016, and Child cried and said he wanted Father. *Id.* at 20-21. Father claimed that before his incarceration, Child called Father "dad." *Id.* at 21.

Father testified that he was in parenting classes "now" and that he completed anger management and victim awareness classes. *Id.* at 22. Father claimed that since his incarceration, he had gotten no information that his son had been taken into care. *Id.* at 23. Father stated that the first he learned of Child's dependency was when DHS presented him with voluntary consents. *Id.* Father admitted that he had served prior periods of incarceration after pleading guilty to drug offenses, and had been arrested at least twelve times. *Id.* at 27-28, 32. Father admitted that, during the five years he was incarcerated, he was not able to meet the basic or daily needs of Child. *Id.*

At the conclusion of the hearing, the trial court terminated Father's parental rights to Child involuntarily, and changed Child's permanency placement goal to adoption. The court entered a decree and order memorializing its decision that same day. Father timely filed notices of appeal and statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Father now raises the following claims for our review:

1) Whether he trial court abused its discretion and erred as a matter of law in terminating [F]ather's rights when DHS failed to meet its burden that termination of parental rights was warranted under 23 [Pa.C.S.A. §] 2511(a) and (b) and the judge's decision was not supported by competent evidence[?]

2) Whether the trial court abused its discretion and erred as a matter of law in changing the permanency goal from reunification as there was not competent evidence that it was in the best interests of the child.

- 6 -

Father's Brief at 8.

We review cases involving the termination of parental rights according to the following standards.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (internal citations and quotations omitted).

> Termination requires a bifurcated analysis:
>
> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

The relevant subsections of 23 Pa.C.S.A. § 2511 provide:

> **(a)** **General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> \*\*\*
>
> **(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

We thus turn to the trial court's order terminating Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a) and (b). The trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *In re B.L.W.,* 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We focus our analysis on 23 Pa.C.S.A. § 2511(a)(1) and (b).

With regard to Section 2511(a)(1), this Court has observed that

- 8 -

To meet the requirements of this section, "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." *In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (citing *In re Adoption of R.J.S.*, 901 A.2d 502, 510 (Pa. Super. 2006)). The court must then consider "the parent's explanation for his or her conduct" and "the post-abandonment contact between parent and child" before moving on to analyze Section 2511(b). *Id*. (quoting *In re Adoption of Charles E.D.M.*, 550 Pa. 595, 708 A.2d 88, 92 (1998)).

This Court has explained that a parent does not perform his or her parental duties by displaying a "merely passive interest in the development of the child." *In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004), appeal denied, 582 Pa. 718, 872 A.2d 1200 (2005) (quoting *In re C.M.S.*, 832 A.2d 457, 462 (Pa. Super. 2003), *appeal denied*, 580 Pa. 687, 859 A.2d 767 (2004)). Rather, "[p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." *Id*. (citation omitted). Critically, incarceration does not relieve a parent of the obligation to perform parental duties. An incarcerated parent must "utilize available resources to continue a relationship" with his or her child. *In re Adoption of S.P.*, 616 Pa. 309, 47 A.3d 817, 828 (2012) (discussing *In re Adoption of McCray*, 460 Pa. 210, 331 A.2d 652 (1975)).

*In re J.T.M.*, 193 A.3d 403, 409 (Pa. Super. 2018).

With regard to a parent's incarceration, in *In re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012), our Supreme Court re-iterated the standard of analysis pursuant to Section 2511(a)(1) for abandonment and added as follows:

[a]pplying [*In re: Adoption of McCray*,] the provision for termination of parental rights based upon abandonment, now codified as § 2511(a)(1), we noted that a parent "has an affirmative duty to love, protect and support his child and to make an effort to maintain communication and association with that child." [460 Pa. 210, 217, 331 A.2d 652, 655]. We observed that

the father's incarceration made his performance of this duty "more difficult." ***Id.***

\* \* \*

[A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child. Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.

***In re Adoption of S.P.***, 47 A.3d at 828, *quoting* ***In re: Adoption of McCray***, 331 A.2d 652, 655 (Pa. 1975) (footnotes and internal quotation marks omitted). Further, the Supreme Court stated, "incarceration neither compels nor precludes termination of parental rights." ***In re Adoption of S.P.***, 47 A.3d at 828 (adopting this Court's statement in ***In re Z.P.***, 994 A.2d 1108, 1120 (Pa. Super. 2010)).

With regard to Section 2511(b), "the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." ***Z.P.***, 994 A.2d at 1121. The court is not required to use expert testimony, and social workers and caseworkers may offer evaluations as well. ***Id.*** Ultimately, the concern is the needs and welfare of a child. ***Id.***

We have stated:

[b]efore granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the intangible dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as

well as the tangible dimension. Continuity of the relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the child[ren]'s needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

*Z.P.*, 994 A.2d at 1121 (quoting *In re C.S.*, 761 A.2d 1197, 1202 (Pa. Super. 2000)). The trial court may equally emphasize the safety needs of the child and may consider intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. *See In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011); *see also In re K.Z.S.*, 946 A.2d 753, 763 (Pa. Super. 2008) (court may emphasize the safety needs of child). Where there is no evidence of a bond between the parent and child, it is reasonable to infer that no bond exists. *Id.* "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

With regard to Section 2511(a)(1), Father argues that he was incarcerated and wished to see his son, but did not know how to make contact with Child. Father's Brief at 18. He contends that the case manager did not make reasonable efforts to help him, and thus, no deliberate abandonment was proven. *Id.* Additionally, Father contends that he cannot correct the conditions leading to the placement of his son as a result of his incarceration,

but he avers that he will be released in 2022 and, thus, can correct the situation his son's mother had created. ***Id.***

The record is clear that for six months prior to the filing of the termination petition, Father failed to perform parental duties. Father made no contact with Child during that time; indeed, the last evidence of any contact with Child was a three-way telephone call with Father from prison toward the end of 2016. N.T., 9/6/19, at 17. Accordingly, we examine Father's explanation for his failure. Father's sole explanation was that he did not know Child had been placed in foster care. However, the record is devoid of any evidence that Father attempted to contact his son in any way for almost three years, regardless of placement. There was no testimony presented that Father had attempted, for example, to arrange a visit in prison with Child, make a telephone call to Child, or to send birthday cards or letters to Child. The next contact Father had with Child was a letter and photograph, sent two weeks prior to his testimony at the termination hearing, and well after the filing of the termination petition.

As this Court has observed, parental duty requires that the parent "act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." ***B.,N.M.***, 856 A.2d at 855. An incarcerated parent must still utilize available resources to continue a relationship with his child. ***S.P.***, 47 A.3d at 828. Here, despite Father's argument that he was unaware of Child's placement, there is no evidence that

- 12 -

he attempted to perform parental duties or, indeed, to contact Child at all until well after the filing of the termination petition.

Consistent with the foregoing, we conclude that the evidence supports the termination of Father's parental rights pursuant to Section 2511(a)(1). Father failed to perform parental duties for six months prior to the filing of the petition, did not provide an adequate explanation for his conduct, and there was only one instance of post-abandonment contact. Accordingly, we examine the effect of the termination of Father's parental rights on Child pursuant to Section 2511(b). *See*, *e.g.*, *Z.S.W.*, 946 A.2d at 731.

Father argues that termination will not best serve the needs and welfare of Child. Father's Brief at 20. Father contends that he loves his son, and that Child calls him "dad," and cried that he missed Father. *Id.* Father claims that he had joint custody of Child for approximately six years prior to his incarceration. *Id.* Finally, Father argues that DHS did not make reasonable efforts towards reunification, and that Child was not called to testify to refute DHS's evidence that no bond existed between Father and Child. *Id.*

The record confirms that no bond existed between Father and Child at the time of the filing of the petition. Father testified that he loved his son, and that his son called him "dad" in 2016. DHS presented evidence that Child wished to be adopted, and Ms. Sullivan testified that Child has a parent/child bond with his pre-adoptive foster parents; does not remember Father; and does not have a bond with Father. N.T., 9/6/19, at 9-11. Ms. Sullivan did not believe that Child would suffer irreparable harm if Father's parental rights

- 13 -

were terminated. *Id.* at 11. The trial court made a credibility determination in favor of DHS' witnesses. *T.S.M.*, 71 A.3d at 267. Thus, the evidence was sufficient to conclude that Father and Child did not share a parent/child bond. *Z.P.*, 994 A.2d at 1121.

We similarly reject Father's argument that any failure of DHS to make reasonable efforts at reunification compels a different result. The Pennsylvania Supreme Court has held

> while reasonable efforts should be considered and indeed, in the appropriate case, a trial court could insist upon their provision, we hold that nothing in the language or the purpose of Section 6351(f)(9) forbids the granting of a petition to terminate parental rights, under Section 2511, as a consequence of the agency's failure to provide reasonable efforts to a parent.

*In re D.C.D.*, 629 A.3d 662, 675 (Pa. 2014).

Accordingly, the court did not err in concluding that it was in Child's best interests for Father's parental rights to be terminated.

We now turn to Father's arguments regarding the permanency goal change order.[3] With regard to dependency cases:

> [t]he standard of review which this Court employs in cases of dependency is broad. However, the scope of review is limited in a fundamental manner by our inability to nullify the fact-finding of the lower court. We accord great weight to this function of the hearing judge because he is in the position to observe and rule upon the credibility of the witnesses and the parties who appear before him. Relying upon his unique posture, we will not overrule his findings if they are supported by competent evidence.

---

[3] The trial court opinion does not address the goal change order.

- 14 -

*In re N.A.*, 116 A.3d 1144, 1148 (Pa. Super. 2015). Thus, we employ an abuse of discretion standard. *In re L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015).

Regarding the disposition of dependent children, the Juvenile Act, 42 Pa.C.S. §§ 6351(e)-(g), provides the criteria for a permanency plan. The court must determine a disposition best suited to the safety and protection, as well as the physical, mental, and moral welfare of the child. *See* 42 Pa.C.S. § 6351(g). With a goal change petition, the trial court

> considers the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.

*In Interest of A.N.P.*, 155 A.3d 55, 67 (Pa. Super. 2017) (quoting *In re A.K.*, 936 A.2d 528, 533 (Pa. Super. 2007).

We have further noted:

> [w]hen a child is adjudicated dependent, the child's proper placement turns on what is in the child's best interest, not on what the parent wants or which goals the parent has achieved. Moreover, although preserving the unity of the family is a purpose of the [Juvenile] Act, another purpose is to "provide for the care, protection, safety, and wholesome mental and physical development of children coming within the provisions of this chapter." 42 Pa.C.S. § 6301(b)(1.1). Indeed, "[t]he relationship of parent and child is a status and not a property right, and one in which the state has an interest to protect the best interest of the child."

*In re K.C.*, 903 A.2d 12, 14-15 (Pa. Super. 2006) (some citations omitted).

- 15 -

Additionally, 42 Pa.C.S. § 6351(f)(9) provides, among several other factors that the court considers at a permanency hearing:

> If the child has been in placement for 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made . . .

*See* 42 Pa.C.S. § 6351(f)(9). The Pennsylvania Supreme Court has reiterated that

> (f)(9) is merely one of a number of factors a trial court must consider in ultimately determining whether the current placement is appropriate or if and when another placement would be appropriate based upon the trial court's assessment of what is "best suited to the safety, protection and physical, mental and moral welfare of the child." 42 Pa.C.S. § 6351 (g).

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). A trial court is not required to itemize its findings, so long as it considers the various factors of § 6351(f), concludes that reunification is not the appropriate placement goal, and provides reasons for its conclusion that are supported by the record. *Id.*

Finally, courts must conduct regular permanency hearings to review the permanency plan of the child. 42 Pa.C.S. § 6351(e)(1). At each permanency hearing, the trial court must determine "whether reasonable efforts were made to finalize the permanency plan in effect." 42 Pa.C.S. § 6351(f)(5.1). Our Court has observed

> neither federal nor Pennsylvania law defines "reasonable efforts." Pennsylvania Court's Office of Child and Families in the Courts, Pennsylvania Dependency Benchbook, § 19.9.1, at 19–33 (2014). Notwithstanding the lack of a legal definition, we discern the

- 16 -

following from prior cases.  Because the focus of the Juvenile Act is on the dependent child, as opposed to parents, any services for parents must directly promote the best interests of the child.  ***In re J.R.***, 875 A.2d at 1118.  "By requiring only 'reasonable efforts' to reunify a family, the statute recognizes that there are practical limitations to such efforts."  ***Id.*** at 1118, n. 5 (citing 43 Pa.C.S. §§ 6351(e) & (f)).

"It is not sufficient for the court to find simply that an action will promote family reunification; the court must also determine whether the action constitutes a *reasonable* effort towards reunification."  ***Id.*** (emphasis in original).  This Court has stressed that the agency is not expected to do the impossible and is not a "guarantor of the success of the efforts to help parents assume their parental duties."  ***In re A.L.D.***, 797 A.2d 326, 340 (Pa. Super. 2002) (citing ***In re J.W.***, 396 Pa.Super. 379, 578 A.2d 952, 959 (1990)).

***In Interest of C.K.***, 165 A.3d 935, 941–42 (Pa. Super. 2017).

Father argues that there was no family service plan or contact with Father so that his progress could be monitored.  Father's Brief at 21-22. Father contends that there were no reasonable efforts on the part of DHS.[4]

***Id.***

---

[4] Father also argues that Paternal Grandmother was never considered as an adoption resource.  However, Father did not preserve the issue in his Pa.R.A.P. 1925(b) statement.  Pa.R.A.P. 1925(b)(4)(ii) (the concise statement of errors on appeal must sufficiently identify the issues an appellant wishes to raise on appeal); ***see also Commonwealth v. Lord***, 719 A.2d 306, 309 (Pa. 1999) (issues not raised in the statement of errors complained of on appeal are deemed waived).  Further, Father did not include this issue in his statement of questions presented in his brief, and did not support his argument with citations to pertinent authority.  ***See*** Pa.R.A.P. 2111(a)(4); Pa.R.A.P. 2119(b); ***Krebs v. United Refining Company of Pennsylvania***, 893 A.2d 776, 797 (Pa. Super. 2006) (an appellant waives issues that are not raised in both his concise statement of errors complained of on appeal and in the statement of questions involved in his brief on appeal); ***Thomas v. Thomas***, 194 A.3d 220, 229 (Pa. Super. 2018) (an appellant's failure to support each issue raised by

In the instant case, there was still a continuing necessity for Child's placement: Father would not be released from prison within any short amount of time. For the duration of the case, Father had been noncompliant with his service plan goals; towards the end of the case, after the filing of the termination and goal change petitions, Father sent one letter to Child. The placement remained appropriate and feasible, as Child was thriving and happy in his pre-adoptive resource, and wished to be adopted. As noted, *supra*, there are practical limitations to the reasonable efforts required and agencies are not expected to do the impossible. *C.K.*, 165 A.3d at 941–42. Here, Father's family service plan goals were limited and Father did not even comply with those goals. It is unclear from the record what further efforts CYF should have made while Father did not update them as to his address or make any attempts to contact Child. Finally, as discussed above, Child's best interests were to be adopted. *A.N.P.*, 155 A.3d at 67.

Accordingly, the court did not err in changing Child's permanency goal to adoption, or in terminating Father's parental rights involuntarily pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b). Thus, we affirm the order and decree.

Order and decree affirmed.

---

discussion and analysis of pertinent authority hampers this court's review and risks waiver). Accordingly, Father has waived this issue for purposes of appeal.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/28/20